# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**ELAINE C. CRONIN,**

**Plaintiff,**

**-vs-**                                                    **Case No.  2:12-cv-288-FtM-29DNF**

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security[1],**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Claimant, Elaine C. Cronin, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for Disability Insurance Benefits (DBI).  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **AFFIRMED** pursuant to §205(g) of the Social Security Act, 42 U.S.C §405(g).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted, therefore, for Commissioner Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section §205(g) of the Social Security Act, 42 U.S.C. §405(g).

I.      **Social Security Act Eligibility**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d) (2); 20 C.F.R. § § 404.1505-404.1511.

II.     **Review of Facts**

A.      **Procedural History**

On February 27, 2009, Claimant filed an Application for Disability Insurance Benefits for the period beginning November 25, 2001. (Tr. 12).  Her claim was initially denied on April 3, 2009 (Tr. 12), and upon reconsideration on December 3, 2009. (Tr. 12, 117-118).  On February 22, 2011, a hearing was held before Administrative Law Judge ("ALJ") M. Dwight Evans. (Tr. 12).  The ALJ's decision, dated March 24, 2011, denied Claimant's claim for benefits. (Tr. 9-22). On April 14, 2012, the Appeals Council denied the Claimant's Request for Review after receiving additional evidence. (Tr. 1-6).

B.      **Background Facts**

Claimant was sixty-four (64) years old on the date of the ALJ's decision. (Tr. 29). She earned a Master's Degree in early childhood education. (Tr. 29).  She previously worked in the field of early childhood education until 1985 (Tr. 32), and later as a housekeeper for approximately fifteen (15) years. (Tr. 156-63).  Claimant's alleged disability is due to obsessive compulsive disorder, sensorineural hearing loss, and depression. (Tr. 23-47).

###### C.    Claimant's Medical History

###### 1. Hearing Loss

On January 15, 2009, Claimant presented for an auditory examination at the University Diagnostic Institute. (Tr. 225-226).  An MRI of the internal auditory canals without contrast revealed unusual morphology of the right petrous internal carotid artery. (Tr. 226).  Dr. Dexter Stallworth believed there was a splitting of this artery which would be better demonstrated with a MRA of the circle of Willis. (Tr. 226).

From January 20, 2009, to February 1, 2009, Claimant received treatment at the Tampa Bay Hearing and Balance Center under the care of Dr. Christopher J. Danner. (Tr. 227-239).  On January 20, 2009, Claimant reported a history of long standing bilateral hearing loss with an acute drop in discrimination in the left ear associated with pain on December 20, 2008. (Tr. 227). The left ear pain radiated on and off to the left jaw for the last 10 years. (Tr. 227).  She also reported undergoing an orthognathic surgery in the 1980s. (Tr. 227).  Claimant reported noticing an 80% improvement in her hearing while on Prednisone 60 milligrams, but claimed the hearing loss returned as the steroids decreased. (Tr. 227). Claimant was diagnosed with sudden hearing loss. (Tr. 228).

On February 1, 2009, Claimant presented for a follow up. (Tr. 230-231). Dr. Christopher J. Danner reported that Claimant had no significant change in hearing when placed on additional steroids. (Tr. 230). Claimant complained of sleep disturbances, difficulty hearing in her left ear with bilateral hearing aids, and frequent headaches. (Tr. 230).  An audiometry test dated January 29, 2009 revealed a 72% unaided recognition score in the left ear. (Tr. 237).

On April 16, 2009, Claimant received treatment at Audiology Consultants of Southwest Florida under the care of Maura Chippendale, M. Ed.,CCC-A. (Tr. 254).    Ms. Chippendale

completed an evaluation regarding Claimant's hearing loss and use of amplification since December 15, 2006. (Tr. 254). She reviewed a serial of audiograms ranging from November 18, 1992, through April 16, 2009. (Tr. 255-261). These audiograms revealed progressive declining sensorineural hearing loss and discrimination bilaterally, with inordinately poor word recognition at the left ear starting in December of 2008. (Tr. 254). Results of an audiogram test conducted on the same day revealed a decline in thresholds on the right ear of 10dB at 500Hz and a decline on the left ear of 10dB at 2000Hz. (Tr. 254). Word recognition continued to be poor at the left ear with a score of 68% and good at the right ear with a score of 88%. (Tr. 254). Ms. Chippendale concluded that, with Claimant's poor word recognition, changes in hearing aid settings would not be of much help. (Tr. 254). Ms. Chippendale advised Claimant of strategies and ways to augment her auditory responses with visual cue. (Tr. 254).

On April 17, 2009, Claimant presented to Radiology Regional Center for a follow up to prior abnormal MRI of right petrous internal carotid artery from January 15, 2009, taken at the University Diagnostic Institute. (Tr. 263). The MRA of the circle of Willis revealed no significant abnormalities. (Tr. 263). The circle of Willis appeared to be complete and the petrous internal carotid arteries had a normal appearance bilaterally. (Tr. 263).

From October 23, 2009, to October 21, 2010, Claimant received treatment at Southwest Florida Center for Hearing and Balance under the care of Dr. Lynda Nally. (Tr. 518-530). On October 23, 2009, Claimant reported noticing fluctuation in her hearing, but an evaluation conducted in January of 2009 indicated some fluctuation but improvement in hearing with stable word recognition. (Tr. 527). A comprehensive audiometry evaluation taken that same day revealed a moderate sensorineural hearing loss bilaterally. (Tr. 527). Word recognition was poor in the left ear with a score of 64% and excellent in the right ear with a score of 96%. (Tr. 527-

528).  Dr. Nally reported a hearing and program change since Claimant's last evaluation and reprogrammed her hearing aids to the current audiogram which helped the hearing a bit. (Tr. 526).

On April 26, 2010, Claimant presented for a follow up. (Tr. 521).  Claimant reported no complaints about her hearing aids and an inspection of the aids revealed that they were working to specifications. (Tr. 521).  An audiogram evaluation taken the same day revealed stable word recognition with a score of 64% in the left ear and a score of 92% in the right ear. (Tr. 522).

On October 21, 2010, Claimant presented for another follow up evaluation. (Tr. 518). Comprehensive audiometry revealed a moderate sensorineural hearing loss bilaterally. (Tr. 518). Word recognition continued to be excellent in the right ear with a score of 92% and fair in the left ear with a score of 72%, which showed a slight improvement since her evaluation in April 2010. (Tr. 518-519).  Claimant's hearing aids were evaluated and determined to be working to specifications. (Tr. 518).  Dr. Nally reported that no further hearing evaluations would be conducted for a year since no changes were reported in the last six months. (Tr. 518).

### 2.  Psychological Impairments

From January 20, 2005, to October 6, 2010, Dr. Roxann Sangiacomo, Suzanne Kay, LMHC, and Alicia Stewart LMHC, provided psychiatric and psychotherapy treatment to the Claimant. (Tr. 359-517).

On January 20, 2005, Suzanne B. Kaye, LMHC, completed a psychiatric evaluation due to Claimant's struggle with depression and obsessive thoughts. (Tr. 373-374). Claimant complained of "sexually religious thoughts that cause outbursts, overwhelming behavior, fatigue, a decrease in pleasurable activity, nervousness, anxiety, and racing, irrational, obsessive, and intrusive thoughts." (Tr. 373).  Ms. Kaye noted an anxious mood and diagnosed

Claimant with generalized anxiety disorder with a Global Assessment of Functioning (GAF) score of 60 and ruled out posttraumatic stress disorder and major depressive disorder (MDD). (Tr. 374). Ms. Kaye placed Claimant on supportive psychotherapy along with cognitive behavioral therapy, to process issues surrounding her obsessive thinking, and noted that the development of new coping skills will be imperative to improve overall functioning. (Tr. 374). Claimant continued to receive treatment with Ms. Kay for one to two times a month until April 20, 2005. (Tr. 373-380).

On February 2, 2005, Dr. Roxann Sangiacomo completed a medical psychiatric evaluation for ongoing problems with social withdrawal, daytime fatigue, reduction in activities, increase in marked anxiety with rumination, and distorted thoughts. (Tr. 376). Claimant reported that her thoughts revolved around obscene images involving religious figures. (Tr. 376). Dr. Sangiacomo noted that Claimant was alert, oriented, goal directed, well dressed and groomed, pleasant and cooperative, but visibly dysphoric. (Tr. 376). Claimant was diagnosed with recurrent severe major depression with psychotic features and a GAF score of 65. (Tr. 377).

Between March 1, 2005, and October 6, 2010, Dr. Sangiacomo continued treating the Claimant for her obsessive compulsive disorder and ongoing negative attitude toward religion. (Tr. 379-493, 512-517). Dr. Sangiacomo noted some fluctuation in Claimant's symptoms and that her functioning improved with psychological treatment and certain combinations of medications. (Tr. 379-493, 512-517).

From February 24, 2006, to May 20, 2010, Claimant received psychotherapy two to three times a month under the care of Alicia L. Stewart, LMHC. (Tr. 359-517). During her sessions with Ms. Stewart, Claimant reported experiencing difficulty dealing with her depression and anxiety, her obsessive compulsive disorder, the death of her brother and how it affected her

overall mood and ability to function, and her frustration toward religion. (Tr. 359-517). Throughout these sessions, Ms. Stewart reiterated the importance of Claimant's psychotherapy treatment to address her depression and her continued development of coping skills to deal with her obsessive thinking. (Tr. 359-517).

### D.     Evaluations Completed at the Request of SSA

On October 19, 2009, Claimant underwent a consultative examination with Dr. Claudia Zsigmond. (Tr. 298-300). Dr. Zsigmond diagnosed Claimant with obsessive compulsive disorder and dysthymic disorder with a GAF score of 53. (Tr. 300). Claimant reported that her obsessive compulsive disorder began at the age of 21 which became overwhelming over time to the point where she could not function at work. (Tr. 298). Despite medications, Claimant continued to have negative intrusive thoughts which led to poor concentration, trouble following instructions and misplacement of items. (Tr. 298). Claimant reported that her depression with symptoms consisting of depressed moods, frequent crying, social isolation, feelings of hopelessness, helplessness, and suicidal ideation started in 2001. (Tr. 298). However, since taking medications, these symptoms have decreased and are manageable. (Tr. 298).

Claimant also reported suffering from a hearing impairment due to a viral infection that occurred in 2008. (Tr. 298). Even with the use of hearing aids, she continued to experience difficulty with her hearing and has poor word discrimination. (Tr. 298). Dr. Zsigmond found that Claimant's ability to handle funds was inadequate due to her mental illness, and that she struggled to initiate and maintain friendships because of her mental illness and hearing loss. (Tr. 300).

On April 3, 2009, Ms. Elizabeth Schuler completed a Physical Residual Functional Capacity report. (Tr. 101-108). Ms. Schuler reported that Plaintiff had a diagnosis of hearing loss. (Tr. 101). Ms. Schuler checked that Claimant had no limitations in exertional, postural, manipulative, visual, or environmental activities. (Tr.  102-105). In addition, Ms. Schuler checked that Claimant had limited hearing and her symptoms were attributable to the hearing loss.  However, the severity of these symptoms were disproportionate to the hearing loss, and Claimant was capable of work within these limits.  (Tr. 105-106).

On April 3, 2009, Dr. Martha Putney completed a Psychiatric Review Technique report at the request of SSA. (Tr. 240-252).  Dr. Putney reported that Claimant had a diagnosis of depression and obsessive compulsive disorder that significantly improved with psychiatric treatment, medication, and counseling. (Tr. 243, 245).  In addition, Dr. Putney indicated that Claimant had mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 250).

On August 17, 2009, Dr. Marc Tafflin completed a Physical Residual Functional Capacity assessment report. (Tr. 290-297). Dr. Tafflin reported Claimant had a diagnosis of sensorineural hearing loss  (Tr.  290), and should avoid concentrated exposure to noise because she would have a difficult time working in a loud environment based on limited hearing.  (Tr. 294). Dr. Tafflin concluded that Claimant's symptoms were attributable to her hearing loss, but the severity was disproportionate to the expected severity. (Tr. 295).  Dr. Tafflin also checked that Claimant had no limitations in exertional, postural, manipulative, or visual activities. (Tr. 291-294).

On November 30, 2009, Dr. Kristin Adams completed a Psychiatric Review Technique report at the request of SSA. (Tr. 302-315).  Dr. Adams reported that Claimant had a diagnosis of

obsessive compulsive disorder (Tr. 307), and had mild difficulties in maintaining concentration, persistence, or pace. (Tr. 312).

### E.     The Administrative Law Judge's Findings

At step 1, the ALJ found Claimant met the insured status requirements of the Social Security Act through March 31, 2012 (Tr. 14; Finding 1), and had not engaged in substantial gainful activity since November 25, 2001, the alleged onset date. (Tr. 14; Finding 2).

At step 2, the ALJ found that Claimant had the following severe impairment: obsessive compulsive disorder. (Tr. 14; Finding 3).  Additionally, the ALJ found that Claimant's alleged impairment of hearing loss was not severe based on a lack of medical records to support a finding of severity. (Tr. 14).  Claimant had been followed since December 2006 and a January 2009 evaluation showed an improvement in her hearing. (Tr. 14).  Furthermore, the ALJ determined Claimant's depression was also not severe, as it appeared to be situational to isolated events, and during a 2009 examination, Claimant reported it was manageable. (Tr. 14).

At step 3, the ALJ found that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15; Finding 4).  In evaluating Claimant's mental impairments, the ALJ determined that the Claimant had no restriction in activities of daily living, no difficulties in social functioning, mild difficulties with concentration persistence or pace, with no extended episodes of decompensation. (Tr. 15).

At step 4, the ALJ found that Claimant had the residual functional capacity to perform work at all exertional and nonexertional limitations. (Tr. 16; Finding 5).  In addition, the ALJ determined that Claimant was capable of performing her past relevant work as a housekeeper, which is categorized by the Dictionary of Occupational Titles (DOT) as skilled, requiring light

exertion. (Tr. 18; Finding 6).  In making this determination, the ALJ compared Claimant's residual functional capacity with the physical and mental demands of her housekeeping work and concluded that the Claimant was able to perform the work as actually and generally performed. (Tr. 18).

In sum, the ALJ concluded that the Claimant had not been under a disability, as defined in the Social Security Act, from November 25, 2001, through March 24, 2011. 20 C.F.R. § 404.1520(f). (Tr. 18; Finding 7).  The ALJ determined that based on the application for a period of disability insurance benefits filed on February 27, 2009, the Claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 18).

## III.  Standard of Review

The scope of this Court's Review is limited to determining whether the ALJ's decision is supported by substantial evidence and based on proper legal standards. *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir.1997); *see also*, 42 U.S.C. § 405(g).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  In conducting this review, this Court may not decide facts anew, reweigh the evidence or substitute its judgment for that of the Commissioner, but must consider the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The ALJ must follow a five-step analysis in evaluating a claim of disability. 20 C.F.R. §§ 404.1520(a).  In the first step the ALJ will consider whether the claimant is engaging in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is found to be engaging in substantial gainful activity, she is not disabled and the inquiry ends. 20 C.F.R. § 404.1520(b).

The second step considers whether the claimant suffers from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii).  If there is not a severe medically determinable impairment or combination of impairments, the claimant is not disabled and the inquiry ends. 20 C.F.R. § 404.1520(c).

The third step also considers the severity of the impairment(s). 20 C.F.R. §1520(a)(4)(iii). If the claimant has an impairment(s) that meets or equals the criteria of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and meets the duration requirement of 20 C.F.R. § 404.1509, the claimant will be found to be disabled. 20 C.F.R. § 404.1520(d).

At the fourth step, the ALJ will assess the residual functional capacity of the claimant, and the claimant's past relevant work. 20 C.F.R. §404.1520(a)(4)(iv).  If the claimant has the residual functional capacity to do her past relevant work, she will not be found disabled. 20 C.F.R. § 404.1520(f).

The fifth step considers the residual functional capacity as well as the age, education, and work experience of the claimant to determine whether she can perform other work besides her past relevant work. 20 C.F.R. §404.1520(a)(4)(v).  If the claimant is able to make an adjustment to other work, she will not be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

The Claimant bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner to determine if there is other work available that the claimant

is able to perform. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  If the Commissioner can demonstrate that there are jobs the claimant can perform, the burden then shifts back to the claimant to show that she is not capable of performing the "other work" as set forth by the Commissioner. *Id.*

**IV.      Specific Issues and Conclusions of Law**

Claimant raises two (2) issues on appeal.  As stated by Claimant, they are: (1) the ALJ failed to identify Claimant's sensorineural hearing loss as a severe impairment; and (2) the ALJ failed to comply with Social Security Ruling 96-8p by improperly assessing Claimant's residual functional capacity.

**A.      Whether the ALJ Erred in Failing to Identify Claimant's Sensorineural Hearing Loss as a Severe Impairment.**

Claimant alleges that the ALJ erred when he failed to identify Claimant's sensorineural hearing loss as a severe impairment. (Pl.'s Br., p. 2, 16).  Specifically, Claimant argues that the ALJ's assessment of severe impairments lacked a discussion of her hearing loss and overlooked years of documented treatment for this condition as well as ongoing diagnosis from multiple independent medical sources. (Pl.'s Br., p. 16).

Under the regulations, an impairment is not severe if it does not significantly limit an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).  *See also*, *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (noting that an impairment is not severe if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience).  The Court of Appeals has further expressed that the severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not

-12-

simply in terms of deviation from purely medical standards of bodily perfection or normality. *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir, 1986).

In the instant case, the ALJ determined that the medical records presented did not support a finding of severity as to Claimant's hearing loss impairment. (Tr. 14). The ALJ acknowledged that Claimant had been treated for hearing loss since December of 2006 when she began to use amplification devices, and that a January 2009 evaluation showed some fluctuation in her hearing, but that it had improved. (Tr. 14, 527). The January 2009 evaluation found Claimant to have stable word recognition, with excellent word recognition in her right ear and poor word recognition in her left ear. (Tr. 527). In addition, the ALJ noted that Claimant wore hearing aids that functioned properly. (Tr. 14, 518, 521).

Furthermore, the ALJ cited to the hearing impairment evaluation conducted by audiology consultant Vicki L. Wiman, MS, CC-A, FAAA in support of his determination that Claimant's hearing loss impairment was not severe. (Tr. 14). Ms. Wiman determined in an April, 2009 Evaluation of Hearing Impairment that Claimant did not meet the listing levels for hearing impairment. (Tr. 190). In her assessment, Ms. Wiman agreed with the severity impairment reflected on the Physical Residual Functional Capacity report prepared by Ms. Elizabeth Schuler on April 3, 2009. (Tr. 190). Ms. Wiman found that Claimant did not meet the listings for impaired hearing under 2.08 based on an audiological report dated January 29, 2009, which indicated that Claimant had a speech discrimination of 100% in the right ear and 72% on the left. (Tr. 190). Moreover, Ms. Wiman noted that the results from the January 29, 2009 test indicated a slight decrease in Claimant's speech discrimination scores from 1992 and January 13, 2009, but that these tests were presented at a softer presentation level. (Tr. 190). Ms. Wiman also stated that none of the test results met listing levels (Tr. 190).

In sum, the record indicates substantial evidence supporting the ALJ's finding that Claimant's hearing loss impairment was not severe.

**B.      Whether the ALJ Erred in Failing to Properly Assess Claimant's Residual Functional Capacity.**

Claimant contends that the ALJ erred by failing to: (1) incorporate Claimant's sensorineural hearing loss in his assessment of her residual functional capacity; and (2) include the required function-by-function assessment. (Pl.'s Br., p. 2, 18-20).

**1.   Whether the ALJ Properly Considered Claimant's Hearing Loss in Assessing Her Residual Functional Capacity**

Claimant argues that, pursuant to Social Security Ruling 96-8p, the ALJ was required to consider all limitations and restrictions imposed by all of the individual's impairments, even those that are not 'severe'. (Pl.'s Br., p. 18).  Claimant contends that the ALJ failed to satisfy this requirement because the ALJ did not consider Claimant's hearing loss in assessing Claimant's residual functional capacity. (Pl.'s Br., p. 18).   Additionally, Claimant argues that the ALJ improperly considered the opinion of Dr. Tafflin regarding her hearing loss because he did not address Dr. Tafflin's physical residual functional capacity findings concerning Claimant's communicative limitations. (Pl.'s Br., p. 20).

The fourth step in the evaluation process requires the ALJ to determine the claimant's residual functional capacity and, based on that determination, decide whether the claimant can return to her previous work despite any impairments or limitations. *McNeal v. Astrue*, 2012 WL 28226, at *20 (M.D. Fla. Jan. 5, 2012). *See also*, *Castel v. Astrue*, 355 F.App'x 260, 263 (11th Cir. 2009).  At step four, the claimant bears the burden to produce evidence showing that she is disabled and its effect on her ability to work on a sustained basis. 20 C.F.R. § 404.1512(a). *See also*, *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) ("claimant . . . must prove at step

four that his impairment prevents him from performing his past relevant work."); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) ("the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."). In making an RFC determination, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'." SSR 96-8p.

In this case, Claimant failed to satisfy the burden of proving that her impairments prevent her from performing her past relevant work as a housekeeper. Claimant did not testify that she had any hearing loss-related limitations in the workplace or that her past relevant work required a noise-free environment, and no such limitations or requirements are apparent from the record other than an issue with word discrimination in her left ear and the volume of both hearing aids. (Tr. 38-39). *See e.g.*, *Surber v. Comm'r of Soc. Sec.*, WL 806325, at *5 (M.D. Fla. Mar. 5, 2013) (finding that Plaintiff failed to prove that her past relevant work required that she be able to hear and understand sounds softer than "whispered sounds."). Furthermore, during her disability evaluation with Dr. Zsigmond, Claimant attributed her 2008 retirement from housekeeping to her obsessive compulsive disorder symptoms, rather than her alleged hearing impairment, and no attempts were made to return to work as a result of the obsessive compulsive disorder. (Tr. 299).

Additionally, the ALJ did not err by failing to consider Claimant's hearing loss in assessing Claimant's RFC. The ALJ acknowledged Claimant's hearing impairment in his opinion and made specific reference to Claimant's medical records concerning such hearing impairment. (Tr. 14). The ALJ's RFC assessment was determined after a "careful consideration of the entire record" and took note of all the alleged impairments Claimant argues causes her inability to work, including to hearing loss. (Tr. 16). Accordingly, the record indicates that the ALJ satisfied Social Security Ruling 96-8p because the ALJ considered all of Claimant's alleged

inability to work, including the non-severe limitation of hearing loss, in assessing the Claimant's RFC.

Claimant further alleges that, even though the ALJ gave considerable weight to the opinion of Dr. Tafflin in supporting his finding of "not-disabled," he improperly considered Dr. Tafflin's findings regarding Claimant's communicative limitations. (Pl.'s Br., p. 20).  However, an ALJ need not include in the residual functional capacity limitations, restrictions, or opinions he has properly rejected or that are otherwise unsupported by the record. *Calvert v. Astrue*, 2013 WL 978984, at *20 n.16 (N.D. Fla. Feb. 11, 2013) (citing *McSwain v. Bowen*, 814 F.2d 617, 620 n. 1 (11th Cir. 1987)).  Dr. Tafflin concluded that Claimant had no exertional limitations, but had limited hearing and would have difficulty working in a loud environment. (Tr. 294).  The ALJ properly disregarded the section of Dr. Tafflin's RFC addressing Claimant's hearing impairment due to the substantial evidence of the record supporting his assessment that Claimant's hearing impairment was not severe.

Even assuming, however, that the ALJ had adopted the section of Dr. Tafflin's RFC pertaining to Claimant's hearing limitations, the ALJ's finding at Step Four in the evaluation process would not have changed.  At the fourth step, if the ALJ determines that a claimant has the residual functional capacity to do the claimant's past relevant work, the claimant will not be found disabled. 20 C.F.R. § 404.1520(f).  In this case, even if the ALJ had adopted Dr. Tafflin's opinion that Claimant would have difficulty working in a loud environment, the Claimant would still be capable of performing her past relevant work as a housekeeper.  Thus, even if the ALJ failed to address Dr. Tafflin's findings regarding Claimant's communicative limitations, this failure is of little import given that the ALJ would still find the Claimant not disabled at step four.

Based on these findings, the undersigned finds that the ALJ did not err in his assessment of Claimant's residual functional capacity as to her hearing loss impairment and correctly determined the Claimant was not disabled at step four of the evaluation process.

### 2. Whether the ALJ Properly Considered All of the Objective Medical Evidence Related to Claimant's Obsessive Compulsive Disorder and Completed a Proper Function-By-Function Analysis

Claimant argues that the ALJ failed to consider all of the objective medical evidence concerning her obsessive compulsive disorder and failed to do a proper function-by-function analysis. (Pl.'s Br., p. 19-20).

In determining a claimant's residual functional capacity, the ALJ must perform an individual or function-by-function assessment of the following capacities: "[s]itting, standing, walking, lifting, carrying, pushing, and pulling." S.S.R. 96–8p, 1996 WL 374184, at *5 (July 2, 1996). However, a written articulation of all seven capacities is not required by the regulations in the ALJ's function-by-function capacity assessment. *Scuilla v. Comm'r of Soc. Sec.*, 2013 WL 525117, at *6 (M.D. Fla. Jan. 18, 2013). In addition, the ALJ must provide a narrative discussion of how the evidence supported the ALJ's decision regarding the claimant's residual functional capacity, referencing medical facts and nonmedical evidence, so that a reviewing court will be able to determine whether the ultimate decision is based on substantial evidence. *Id.* The court, however, does not require the ALJ to specifically refer to every piece of evidence in his decision, so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.* (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)).

In arriving at Claimant's residual functional capacity, the ALJ considered the entire record and found that the degree of limitation alleged by the Claimant was not supported by the

evidence in the record. (Tr. 17).   The ALJ ultimately decided that Claimant had the residual functional capacity to perform a full range of work at all exertional and nonexertional limitations and thus was capable of performing her past relevant work. (Tr. 16-18).

In his assessment of Claimant's residual functional capacity, the ALJ noted that Claimant had received regular treatment for her obsessive compulsive disorder with Dr. Roxann Sangiacomo and licensed mental health counselor, Alicia Stewart. (Tr. 17).   Their evaluations supported a finding of non-disability since treatment notes indicated Claimant's mood was consistently stable, counseling helped her learn coping skills to control her mental impairment, and she showed improvement with psychological treatment and her medication regimen. (Tr. 17).   Moreover, treatment notes showed that Claimant's functioning continued to improve as she appeared to be bright, pleasant and positive, and that her period of absence from treatment suggested that her symptoms may not have been as serious as had been alleged. (Tr. 17).

Additionally, the ALJ discussed the disability evaluation conducted by Dr. Claudia Zsigmond, which reflected a diagnosis of obsessive compulsive disorder but did not assess the Claimant's functional limitations. (Tr. 17).   Dr. Zsigmond noted that even though Claimant had an anxious affect and appeared in mild mental distress, she was alert and well oriented, with no symptoms of psychosis. (Tr. 17).   Moreover, she appeared appropriately dressed and groomed, her speech and thought processes were logical and coherent, and she had good recall of recent and remote events, which suggested no severe short-term or long-term memory impairment. (Tr. 17).

Furthermore, the ALJ noted that in her testimony, Claimant described performing daily activities, which were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. (Tr. 17).   Claimant testified that she liked to read for over an

hour a day and did not have issues with concentration, she was able to listen to classical music, enjoyed painting two to two and a half hours a day, used exercise equipment twice per week, and took two-mile walks about three times a week. (Tr. 17).

The findings of Dr. Sangiacomo, Ms. Stewart, Dr. Zsigmond, and Claimant's own testimony are consistent with the ALJ's final determination that Claimant was capable of performing the duties of her past work as a housekeeper.  Therefore, the undersigned concludes that the ALJ properly completed an assessment of Claimant's residual functional capacity based on substantial evidence from the record.

## V.  Conclusions

For the foregoing reasons, the ALJ's decision is consistent with the requirements of law and supported by substantial evidence.  Therefore, it is respectfully recommended that the decision of the Commissioner as to these issues be **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** in Chambers in Ft. Myers, Florida this 21st day of August, 2013.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record